**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**March 2, 2020**

**FOR THE TENTH CIRCUIT**
_____

HIGH COUNTRY CONSERVATION
ADVOCATES; WILDEARTH
GUARDIANS; CENTER FOR
BIOLOGICAL DIVERSITY; SIERRA
CLUB; WILDERNESS WORKSHOP,

    Plaintiffs - Appellants,

v.

No. 18-1374

UNITED STATES FOREST SERVICE;
UNITED STATES DEPARTMENT OF
AGRICULTURE; DANIEL JIRÓN, in his
official capacity as Acting Under Secretary
of Agriculture for Natural Resources and
Environment, U.S. Department of
Agriculture; SCOTT ARMENTROUT, in
his official capacity as Supervisor of the
Grand Mesa Uncompahgre, and Gunnison
National Forests; UNITED STATES
DEPARTMENT OF INTERIOR;
BUREAU OF LAND MANAGEMENT;
KATHERINE MACGREGOR, in her
official capacity as Deputy Assistant
Secretary, Land and Minerals
Management, U.S. Department of Interior,

    Defendants - Appellees,

and

MOUNTAIN COAL COMPANY, LLC,

    Intervenor Defendant - Appellee.
_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:17-CV-03025-PAB)**
_____

Robin Cooley, Earthjustice, Denver, Colorado (Yuting Chi, Earthjustice, Denver, Colorado, and Nathaniel Shoaff, Sierra Club, Oakland, California, with her on the briefs), for Plaintiffs-Appellants.

John Emad Arbab, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C. (Jeffery Bossert Clark, Eric Grant, John L. Smeltzer, John S. Most, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C.; Stephen Alexander Vaden, Kenneth Capps, Office of the General Counsel, U.S. Department of Agriculture; and Kristen Guerriero, Office of the Solicitor, U.S. Department of the Interior, with him on the brief), for Defendants-Appellees.

Michael Drysdale, Dorsey & Whitney LLP, Minneapolis, Minnesota (Sarah Goldberg, Dorsey & Whitney LLP, Salt Lake City, Utah, with him on the brief), for Intervenor Defendant-Appellee.
_____

Before **BRISCOE**, **KELLY**, and **LUCERO**, Circuit Judges.
_____

**LUCERO**, Circuit Judge.
_____

This appeal is the latest installment in a long-running dispute concerning road construction and coal leases in National Forest lands near the North Fork of the Gunnison River in Colorado. The Colorado Roadless Rule, which the Forest Service adopted in 2012, prohibits road construction in designated areas but included an exception for the North Fork Coal Mining Area (the "North Fork Exception"). See Special Areas; Roadless Area Conservation; Applicability to National Forests in Colorado, 77 Fed. Reg. 39,576, 39,578 (July 3, 2012). In prior litigation, a district court concluded agency decisions violated the National Environmental Policy Act

2

("NEPA") and the Administrative Procedure Act ("APA"), High Country Conservation Advocates v. U.S. Forest Serv., 52 F. Supp. 3d 1174, 1181 (D. Colo. 2014) ("High Country I"), and vacated the North Fork Exception, High Country Conservation Advocates v. U.S. Forest Serv., 67 F. Supp. 3d 1262, 1266-67 (D. Colo. 2014) ("High Country II").

Following these decisions, the Forest Service prepared a Supplemental Final Environmental Impact Statement ("North Fork SFEIS") and readopted the Exception, Roadless Area Conservation; National Forest System Lands in Colorado, 81 Fed. Reg. 91,811 (Dec. 19, 2016). Mountain Coal Company, LLC, submitted lease modification requests in connection with coal leases in the area. In response, the Forest Service and the Bureau of Land Management ("BLM") issued a Supplemental Final Environmental Impact Statement ("Leasing SFEIS") and approved the requests.

In the instant litigation, a coalition of environmental organizations alleges that the agencies violated NEPA and the APA by unreasonably eliminating alternatives from detailed study in the North Fork SFEIS and the Leasing SFEIS. The district court rejected these challenges. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse as to the North Fork SFEIS, holding that the Forest Service violated NEPA by failing to study in detail the "Pilot Knob Alternative" proposed by plaintiffs. Accordingly, we remand to the district court with instructions to vacate the North Fork Exception. With respect to the Leasing SFEIS, we hold NEPA did not require consideration of the "Methane Flaring Alternative" proposed by plaintiffs.

**I**

The North Fork Coal Mining Area includes parts of three roadless areas: Pilot Knob, Sunset, and Flatirons. The Flatirons and Sunset Roadless Areas are south of the North Fork River and Highway 133. The Pilot Knob Roadless Area is separated from the others, lying north of the river and highway. Mountain Coal operates the West Elk Mine, which is the only operating coal mine in the valley and is located in the Sunset Roadless Area. There is also an idled mine, the Elk Creek Mine, partially located in the Pilot Knob Roadless Area. Coal production at that mine ceased in 2013; as of 2015, its operator was focused on final reclamation work.

In 2012, after the Forest Service adopted the Colorado Roadless Rule, BLM approved lease modifications extending Mountain Coal's leases in the Sunset Roadless Area. Conservation groups filed suit challenging the Colorado Roadless Rule, the lease modifications, and a related exploration plan. The district court concluded that the agencies violated NEPA in analyzing the North Fork Exception and the lease modifications. High Country I, 52 F. Supp. 3d at 1181. After additional briefing on remedies, it severed and vacated the North Fork Exception and vacated the approval of the lease modifications. High Country II, 67 F. Supp. 3d at 1266-67.

The Forest Service initiated a new rulemaking process to reimplement the Exception. In response to a draft of the North Fork SFEIS, conservation groups submitted a comment requesting that the Forest Service analyze an alternative that would prohibit road construction in the Pilot Knob Roadless Area but permit it in the other two areas. The groups stated that this alternative—the Pilot Knob

4

Alternative—would protect 5000 acres, permit mining on 14,800 acres and make available 128 million short tons of coal while preserving a geographically and ecologically distinct roadless area. In the North Fork SFEIS, the Forest Service eliminated the Pilot Knob Alternative from detailed study with the following explanation:

> This alternative would remove the Pilot Knob Roadless Area, about 5,000 acres (about 25%) of the project area, from the North Fork Coal Mining Area. This alternative was dismissed from detailed analysis because the Colorado Roadless Rule is considering access to coal resources within the North Coal Mining Area [sic] over the long-term based on where recoverable coal resources might occur. The Rule preserves the option of future coal exploration and development by allowing temporary road construction for coal exploration and coal-related surface activities. One of the State-specific concerns is the stability of local economies in the North Fork Valley and recognition of the contribution that the coal industry provides to those communities. Preserving coal exploration and development opportunities in the area is a means of providing community stability.

Instead, the Forest Service offered detailed analyses of three options: (A) no action, which would preserve all three areas as roadless; (B) promulgation of the entire North Fork Exception, permitting mining on 19,700 acres and providing access to 172 million short tons of coal; and (C) promulgation of the North Fork Exception excluding "wilderness capable" lands in the Sunset and Flatirons Roadless Areas, which would protect 7100 acres, permit mining on 12,600 acres, and provide access to 95 million short tons of coal. Ultimately, the Forest Service adopted Alternative B, reimplementing the entire North Fork Exception.

Subsequently, Mountain Coal resubmitted two applications for lease modifications, seeking to add a total of approximately 1720 acres to federal coal

5

leases adjacent to the West Elk Mine. Approximately 1700 acres of the area at issue were within the Sunset Roadless Area and covered by the North Fork Exception. In response to the requests, the Forest Service and BLM issued a draft of the Leasing SFEIS. Environmental groups requested that the agencies analyze a Methane Flaring Alternative in the final version. Flaring converts methane, an especially potent greenhouse gas, to carbon dioxide, a less potent greenhouse gas. Under the Methane Flaring Alternative, Mountain Coal would be required to flare methane, thereby mitigating the environmental impact. In the Leasing SFEIS, the agencies eliminated the Methane Flaring Alternative from detailed study, concluding that evaluating methane mitigation measures requires site-specific data and engineering designs unavailable at the leasing stage. With consent from the Forest Service, BLM approved the modifications.

In the instant litigation, plaintiffs challenge the elimination from detailed study of the Pilot Knob Alternative in the North Fork SFEIS and the Methane Flaring Alternative in the Leasing SFEIS. The district court denied them relief, ruling the agency actions under NEPA did not violate the APA. Plaintiffs timely appealed.[1]

---

[1] After this appeal was filed, the Office of Surface Mining Reclamation and Enforcement ("OSM") adopted the Leasing SFEIS and recommended that the Secretary of the Interior approve a mining plan modification proposed by Mountain Coal. Notice of Record of Decision for the West Elk Mining Plan Modification, 84 Fed. Reg. 9554, 9556 (Mar. 15, 2019). The Department of the Interior approved the mining plan modification, and the plaintiffs in this case filed a separate lawsuit challenging OSM's decision. WildEarth Guardians v. Bernhardt, No. 19-CV-001920-RBJ 2019 WL 5853870 (D. Colo. Nov. 8, 2019). The district court remanded the decision to OSM and enjoined coal mining pursuant to approval of the mining-plan modification. Id. at *15.

## II

Because NEPA does not provide a private right of action, the agencies' promulgation of the North Fork SFEIS and the Leasing SFEIS are reviewed as final agency actions under the APA. See Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209, 1226 (10th Cir. 2011). We review the district court's decision de novo. Id.

Under the APA, we will set aside agency action only if it "fails to meet statutory, procedural or constitutional requirements, or . . . is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv., 248 F.3d 1277, 1281 (10th Cir. 2001) (quotation omitted). Agency action is arbitrary and capricious if an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or the agency action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "In performing arbitrary and capricious review, we accord agency action a presumption of validity; the burden is on the petitioner to demonstrate that the action is arbitrary and capricious." Copar Pumice Co. v. Tidwell, 603 F.3d 780, 793 (10th Cir. 2010) (quotations omitted). We will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," but will not "supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43 (quotations omitted).

7

"NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives." N.M. ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 703 (10th Cir. 2009). The "twin aims" of NEPA are to require agencies to "consider every significant aspect of the environmental impact of a proposed action" and to facilitate public involvement. Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 97 (1983). NEPA creates "a set of action-forcing procedures that require that agencies take a hard look at environmental consequences, and that provide for broad dissemination of relevant environmental information." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (quotations and citation omitted). However, it "is strictly a procedural statute" that "does not mandate substantive results." Wyoming, 661 F.3d at 1237.

Under NEPA, an agency must include an environmental impact statement ("EIS") in reports on "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must include, inter alia, "alternatives to the proposed action." § 4332(C)(iii). As explained in NEPA regulations, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a); see also Westlands Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853, 868 (9th Cir. 2004) ("The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." (quotation omitted)).

8

In reviewing the adequacy of an agency's analysis of alternatives in an EIS, we apply a "rule of reason," determining whether the "statement contained sufficient discussion of the relevant issues and opposing viewpoints to enable the [agency] to take a hard look at the environmental impacts of the proposed [action] and its alternatives, and to make a reasoned decision." Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1174 (10th Cir. 1999). This "reasonableness standard applies both to which alternatives the agency discusses and the extent to which it discusses them." Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1166 (10th Cir. 2002), as modified on reh'g, 319 F.3d 1207 (10th Cir. 2003).

"[O]nce an agency establishes the objective of the proposed action—which it has considerable discretion to define—the agency need not provide a detailed study of alternatives that do not accomplish that purpose or objective, as those alternatives are not 'reasonable.'" Wyoming, 661 F.3d at 1244 (citations omitted). But agencies may not "define the objectives of a proposed action so narrowly as to preclude a reasonable consideration of alternatives." Id. (quotation and alteration omitted). In short, "NEPA does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective." Richardson, 565 F.3d at 708 (quotation omitted). Moreover, "an agency need not consider an alternative unless it is significantly distinguishable from the alternatives already considered." Id. at 708-09.

**A**

9

Turning to the North Fork SFEIS, we must determine whether the Forest Service reasonably eliminated the Pilot Knob Alternative from detailed study. We judge the reasonableness of the agency action against two guideposts: (1) "the agency's statutory mandate" and (2) the "agency's objectives for a particular project." Id. at 709. With respect to the first guidepost, the Forest Service's statutory mandate grants it "broad discretion to regulate the national forests, including for conservation purposes." Wyoming, 661 F.3d at 1234 (citing 16 U.S.C. § 551). It similarly possesses the authority "to manage the national forests for 'multiple uses,' including 'outdoor recreation, range, timber, watershed, and wildlife and fish purposes.'" Id. at 1235 (quoting 16 U.S.C. § 528). We have little trouble concluding that the Pilot Knob Alternative, which would preserve one roadless area and open two others for coal mining, falls within the Forest Service's statutory mandate.

As to the Forest Service's objectives for the particular project, the North Fork SFEIS states, "the specific purpose and need for reinstating the North Fork Coal Mining Area exception is to provide management direction for conserving about 4.2 million acres of [Colorado roadless areas] while addressing the state's interest in not foreclosing opportunities for exploration and development of coal resources in the North Fork Coal Mining Area." More specifically, the North Fork SFEIS recognizes the "need . . . to provide for the conservation and management of roadless area characteristics," including "sources of drinking water, important fish and wildlife habitat, semi-primitive or primitive recreation areas . . . and naturally appearing

landscapes." It also recognizes the need to "facilitat[e] exploration and development of coal resources in the North Fork coal mining area." The specific project purpose thus echoes the Forest Service's general statutory mandate of balancing multiple possible uses. And the Pilot Knob Alternative would appear to fit within the stated project goals: it provides for conservation in one roadless area and facilitates the development of coal resources in two others.

However, the Forest Service dismissed this alternative from detailed consideration "because the Colorado Roadless Rule is considering access to coal resources within the North [Fork] Coal Mining Area over the long-term based on where recoverable coal resources might occur." Its explanation is based solely on the fact that the Pilot Knob Alternative would protect more land and provide access to fewer tons of coal than Alternative B (reinstating the entire North Fork Exception). But that factor is relevant to only one of the agency's established objectives—providing for long-term coal-exploration and mining opportunities. It does not address the Forest Service's other objective—providing management direction for conserving roadless areas in Colorado. This one-sided approach conflicts with the agency's obligation under NEPA to "provide legitimate consideration to alternatives that fall between the obvious extremes." Dombeck, 185 F.3d at 1175. Under the agency's logic, every alternative except Alternative B could have been eliminated from detailed study merely because it forecloses long-term coal mining opportunities.

QED: The Forest Service's rationale for eliminating the Pilot Knob Alternative is arbitrary. In light of the agency's stated objectives, the proffered

11

explanation does not establish that the alternative was rejected as too remote, speculative, impractical, or ineffective. Where the agency omits an alternative but fails to explain why that alternative is not reasonable, the EIS is inadequate. See Utahns for Better Transp., 305 F.3d at 1170-71.

This failure is similar to BLM's failure in Richardson. In that case, BLM eliminated an alternative that would have closed the Otero Mesa to mining, stating it was inconsistent with the project purpose of determining which lands "are suitable for leasing and subsequent development." 565 F.3d at 710. We explained that the project "purpose does not take development of the Mesa as a foregone conclusion. To the contrary, the question of whether any of the lands in the plan area [we]re 'suitable' for fluid minerals development . . . [was] precisely the question the planning process was intended to address." Id. at 711 (emphasis omitted). We rejected the argument "that it would be impractical or ineffective under multiple-use principles to close the Mesa to development," holding the agency "was required to include such an alternative in its NEPA analysis, and the failure to do so was arbitrary and capricious." Id. (quotations omitted). Similarly, the agency's elimination of an alternative from detailed study in this case was arbitrary and capricious because its explanation for doing so was inconsistent with its stated purpose.[2]

---

[2] The dissent attempts to distinguish Richardson because in that case, BLM "took oil and gas development of Otero Mesa as a foregone conclusion and should have analyzed an alternative that would have precluded development," whereas the

12

In its briefs, the Forest Service asserts that the idled Elk Creek Mine, located in the Pilot Knob Roadless Area, presents distinct long-term opportunities for coal access that would be foreclosed by the Pilot Knob Alternative but not by Alternative C. But this is not the explanation the Forest Service gave for eliminating the Pilot Knob Alternative. We "may affirm agency action, if at all, only on the grounds articulated by the agency itself." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1565 (10th Cir. 1994). We cannot consider a "post-hoc rationalization" for eliminating an alternative from consideration in an EIS. Utahns for Better Transp., 305 F.3d at 1165. Because the North Fork SFEIS does not state that the Pilot Knob Alternative was eliminated from detailed study because of the existence of the Elk Creek Mine, we cannot affirm the agency's decision on that basis.[3]

---

Forest Service in this case did evaluate such an alternative—Alternative A. But Richardson is not limited to cases in which the proposed action would prohibit development. The Forest Service's consideration of a no-action alternative in this case does not excuse the unreasonableness of its explanation for excluding the Pilot Knob Alternative from detailed study.

[3] The dissent would hold that the inclusion of findings with respect to the Elk Creek Mine in a different part of the North Fork SFEIS shows that the agency dismissed the Pilot Knob Alternative from detailed analysis because of the presence of the Elk Creek Mine. This is inconsistent with the administrative record. In the Forest Service's explanation of why it eliminated the Pilot Knob Alternative from detailed study, the agency mentions access to coal "over the long term," "future coal exploration and development," and "the stability of local economies." It does not mention the Elk Creek Mine or compare the potential of the Elk Creek Mine with the long-term coal mining opportunities foreclosed by Alternative C.

13

The dissent adds that the Pilot Knob Alternative, unlike Alternative C, would foreclose access to existing federal coal leases or private leases and recoverable coal. But this fact does not render the Pilot Knob Alternative unreasonable. Alternative A—the no-action alternative—would also have foreclosed access to existing federal coal leases, private leases, and recoverable coal. But that did not prevent the Forest Service from considering it. Further, although Alternative C would not foreclose access to any existing federal coal leases, it would nevertheless prohibit coal mining in part of the Sunset Roadless Area subject to a proposed lease modification.

The Forest Service also argues that the Pilot Knob Alternative is not significantly distinguishable from Alternative C.[4] We disagree. Alternative C would protect 7100 acres of wilderness, whereas the Pilot Knob Alternative would protect 4900 acres. That is, the Pilot Knob Alternative would protect 2100 fewer acres— nearly 30% less land. This 2100-acre difference represents more than 10% of the entire North Fork Coal Mining Area.

The difference in accessible tons of coal is even greater. Alternative C would allow access to 95 million short tons of coal, whereas the Pilot Knob Alternative would allow access to 128 million short tons of coal. This represents 33 million short tons, which is approximately 35% more coal than Alternative C and 19% of the total amount of coal recoverable in the entire North Fork Coal Mining Area.

---

[4] This, too, is a post-hoc rationalization not mentioned in the agency's discussion of why it eliminated the Pilot Knob Alternative from detailed study.

14

Further, the Pilot Knob Alternative is significantly distinguishable from Alternative C because it would affect entirely separate coal resources. The record indicates that if the North Fork Exception were reimplemented, mining would be less likely to occur in the areas protected under the Pilot Knob Alternative than in the areas protected under Alternative C. The Pilot Knob Alternative would foreclose mining on land adjacent to the idle Elk Creek Mine, which has not produced any coal since December 2013. The mine does not appear likely to resume production, as its operator has auctioned off mining equipment and demolished mining infrastructure within the mine. In contrast, Alternative C would foreclose mining in the Flatirons and Sunset Roadless Areas adjacent to an active coal mine—the West Elk Mine. The operator of the West Elk Mine, moreover, has applied for lease modifications that would extend the mine into areas that would be protected under Alternative C. In short, the Pilot Knob Alternative would foreclose mining only if production at the Elk Creek Mine resumed, whereas Alternative C would foreclose expansion of coal leases already sought by the operator of the West Elk Mine.

Moreover, the two alternatives would result in significantly different environmental impacts because the Pilot Knob Roadless Area is geographically separate from, and has habitat features dissimilar to, the Sunset and Flatirons Roadless Areas. We have recognized, albeit in a different context, that "location, not merely total surface disturbance, affects" environmental impacts and that "the location of development greatly influences the likelihood and extent of habitat preservation." Richardson, 565 F.3d at 706, 707. Of the three roadless areas, only

15

the Pilot Knob Roadless Area contains a winter range for deer and bald eagles, a severe winter range for elk, and a historic and potential future habitat for the Gunnison sage-grouse. See Balt. Gas, 462 U.S. at 97 (NEPA requires agencies to "consider every significant aspect of the environmental impact of a proposed action").[5]

In sum, we conclude that the Pilot Knob Alternative and Alternative C are significantly distinguishable because they differ in acreage of protected land, amounts of recoverable coal, likelihood of coal mining activity, and environmental impacts. We recognize that agencies must engage in line-drawing and are due deference in that exercise. See Wyoming, 661 F.3d at 1250. "By necessity, an agency must select a certain number of [alternatives] for serious study and eliminate the rest without detailed analysis," Prairie Band Pottawatomie Nation v. Fed. Highway Admin., 684 F.3d 1002, 1012 (10th Cir. 2012). Nevertheless, NEPA and the APA require agencies to act reasonably in eliminating alternatives from detailed study. In this case, the Forest Service failed to provide a logically coherent explanation for its decision to eliminate the Pilot Knob Alternative. That alternative was not "remote, speculative, or impractical or ineffective" as judged against the

---

[5] The dissent correctly notes that some of these ecological features occur in other parts of the state outside of the three roadless areas at issue in this case. But this is irrelevant; our inquiry is whether the ecological consequences of the Pilot Knob Alternative would be significantly distinguishable from those of the other alternatives. We therefore consider whether the Pilot Knob Roadless Area is ecologically unique with respect to the areas protected under the other alternatives, not with respect to the entire state.

16

Forest Service's statutory mandate and the project goals. Richardson, 565 F.3d at 708 (quotation omitted). And it was "significantly distinguishable from the alternatives already considered." Id. at 708-09. We thus conclude that the Forest Service's elimination of the Pilot Knob Alternative from detailed study in the North Fork SFEIS was arbitrary and capricious.

**B**

Plaintiffs also challenge the elimination from detailed study of the Methane Flaring Alternative in the agencies' promulgation of the Leasing SFEIS. The Leasing SFEIS's stated purpose was to "facilitate recovery of federal coal resources in an environmentally sound manner." It provided two bases for the agencies' decision to eliminate the Methane Flaring Alternative from detailed study.

First, the Forest Service and BLM included a section on their elimination from detailed study of alternatives requiring Mountain Coal to use methane-mitigation measures. They noted that assessing any potential methane-mitigation measure requires "site-specific exploration data" and "resultant engineering designs," which would be part of the mine-permitting process conducted by state agencies, OSM, and the federal Mine Safety and Health Administration ("MSHA"). And the agencies found that the effectiveness of portable methane flares in the lease modification area

17

is uncertain because the effectiveness of a flare depends on a particular methane drainage well's gas composition, which was not available at the leasing stage.[6]

Plaintiffs argue that the Forest Service and BLM had sufficient data to evaluate the Methane Flaring Alternative from the existing operation at the West Elk Mine and the lease-modifications proposal. But they do not offer evidence indicating that the information available at the time was sufficient to analyze the feasibility and environmental impacts of methane flaring without the site-specific exploration data and engineering designs deemed necessary by the agencies. We are mindful that environmental analyses under NEPA must be conducted at "the earliest possible time." 40 C.F.R. § 1501.2. Nonetheless, given the plaintiffs' lack of evidence, we conclude that the elimination of the Methane Flaring Alternative was reasonable.

Second, the Leasing SFEIS explains that MSHA approval, which occurs later in the mine-permitting process, is required for any flare-use proposal. It also notes that, at the time it was issued, MSHA had not approved any flaring operations at active coal mines.[7] In response, plaintiffs contend that the Forest Service and BLM

---

[6] The Leasing SFEIS states that the engineering designs would become available during the state and OSM mine-permitting processes. In reviewing the OSM decision issued after the filing of this appeal, the district court vacated the approval of the mining-plan modification partly because OSM did not rigorously explore and objectively evaluate methane flaring. WildEarth Guardians v. Bernhardt, 2019 WL 5853870, at *9-10.

[7] After this appeal was filed, Mountain Coal submitted to MSHA a proposal for a methane flaring system at the active West Elk Mine. WildEarth Guardians v. Bernhardt, 2019 WL 5853870, at *14 n.4. Mountain Coal represents that MSHA has approved the proposed flaring system and that the Assistant Secretary of Land and

18

are authorized to condition leases to protect the environment and that BLM in particular is required to ensure that coal leases contain provisions "for the safeguarding of the public welfare." 30 U.S.C. § 187. We agree that the Forest Service and BLM are broadly authorized to create conditions for coal leasing. But they are not the agencies charged with approving flaring. Because at the time they issued the Leasing SFEIS, it was uncertain whether MSHA would approve methane flaring for an active coal mine, we conclude it was reasonable for the Forest Service and BLM to eliminate the Methane Flaring Alternative from detailed study.[8]

Because the Leasing SFEIS contains sufficient discussion of the relevant issues, we are convinced that the agencies took a hard look at the Methane Flaring Alternative. Their elimination from detailed study of the alternative was not arbitrary and capricious.

---

Minerals Management has authorized it. The Colorado state permitting process for the system, however, is not yet complete. These recent developments are not relevant to our analysis of whether the Leasing SFEIS complied with NEPA.

[8] When promulgating the North Fork SFEIS earlier in the mine-permitting process, the Forest Service declined to study methane flaring in detail, stating that "methane flaring is best considered at the leasing stage when there is more information on the specific minerals to be developed and the lands that would be impacted by a flaring operation." Plaintiffs contend this statement is inconsistent with the agencies' present position that the leasing stage is too early to study the Methane Flaring Alternative in detail. Although this factor weighs against concluding that it was reasonable for the agencies to eliminate the Methane Flaring Alternative, we must address the reasonableness of the agencies' actions based on the reasons provided in the Leasing SFEIS. Further, the other reason the Forest Service declined to study methane flaring in detail in the North Fork SFEIS is that MSHA could decide not to allow flaring, resulting in contradictory agency rules. This reason is consistent with the Leasing SFEIS.

With respect to the North Fork SFEIS, plaintiffs seek vacatur of the North Fork Exception. Mountain Coal contends that the appropriate remedy is vacatur of the Exception only as applied to the Pilot Knob Roadless Area. "Under the APA, courts 'shall' 'hold unlawful and set aside agency action' that is found to be arbitrary or capricious. Vacatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts." WildEarth Guardians v. U.S. Bureau of Land Mgmt., 870 F.3d 1222, 1239 (10th Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)).

We have taken several different steps when reversing a district court decision and finding a violation of NEPA. We have: "(1) reversed and remanded without instructions, (2) reversed and remanded with instructions to vacate, and (3) vacated agency decisions." Id. The typical remedy for an EIS in violation of NEPA is remand to the district court with instructions to vacate the agency action. See, e.g., Diné Citizens Against Ruining Our Env't v. Bernhardt, 923 F.3d 831, 859 (10th Cir. 2019). But a court "may partially set aside a regulation if the invalid portion is severable," that is, "if the severed parts operate entirely independently of one another, and the circumstances indicate the agency would have adopted the regulation even without the faulty provision." Ariz. Pub. Serv. Co. v. U.S. E.P.A., 562 F.3d 1116, 1122 (10th Cir. 2009) (quotation omitted).

The Colorado Roadless Rule includes a severability clause providing that, "[i]f any provision in this subpart [C.F.R. Title 36, Chapter II, Part 294, Subpart D] or its application to any person or to certain circumstances is held to be invalid, the

20

remainder of the regulations in this subpart and their application remain in force." 36 C.F.R. § 294.48(f). The record of decision accompanying the final rules clarifies that "[t]his provision identifies the Department's intention that, in the event any provision is determined invalid, the remaining portions of the rule would remain in force." Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3244, 3260 (Jan. 12, 2001). The North Fork Exception is codified in the same subpart as the severability clause. Accordingly, the regulations contemplate vacatur of any provision of the North Fork Exception that is held to be invalid.

Mountain Coal urges us to sever and vacate the North Fork Exception only as applied to the Pilot Knob Roadless Area. We turn to the language of the Exception as promulgated to determine whether it contains a severable provision applying only to the Pilot Knob Area. The regulation permits temporary road construction for coal-related surface activities on "certain lands with Colorado Roadless Areas within the North Fork Coal Mining Area of the Grand Mesa, Uncompahgre, and Gunnison National Forests as defined by the North Fork Coal Mining Area displayed on the final Colorado Roadless Areas map." 36 C.F.R. § 294.43(c)(ix). There is no provision in the Rule that relates only to the Pilot Knob Roadless Area; rather, severing and vacating the North Fork Exception as applied only to the Pilot Knob Roadless Area would require rewriting the regulation. Mountain Coal specifically asks us to add the words "except Pilot Knob" to the regulation rather than striking any portion of the text. In light of the structure of the rule, we conclude that the portion of the North Fork Exception applying to the Pilot Knob Roadless Area is not

21

severable from the remainder of the Exception because it does not operate independently.

Moreover, the North Fork SFEIS dealt with the North Fork Coal Mining Area as a whole,[9] rather than only with the Pilot Knob Roadless Area. We conclude that the Forest Service acted arbitrarily and capriciously in its analysis of the entire North Fork Exception by failing to study in detail the Pilot Knob Alternative. Under our traditional equitable powers to fashion appropriate relief, which are retained under the APA, 5 U.S.C. § 702, the appropriate remedy is vacatur of the entire North Fork Exception.

## IV

For the foregoing reasons, we **VACATE** the district court's judgment and **REMAND** the case for entry of an order vacating the North Fork Exception.

---

[9] In <u>High Country II</u>, the district court cited the Colorado Roadless Rule's severability clause, severed the North Fork Exception from the remainder of the Rule, and vacated the Exception. 67 F. Supp. 3d at 1266. At issue in this case is the re-promulgation of the North Fork Exception.

No. 18-1374, <u>High Country Conservation Advocates, et al. v. United States Forest Service, et al.</u>

**KELLY**, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's decision that NEPA did not require consideration of the methane flaring alternative but respectfully dissent from the conclusion that U.S. Forest Service was required to consider the Pilot Knob alternative in detail. This time around, the Forest Service considered three alternatives in detail and eliminated 12 others from such consideration, including the Pilot Knob alternative. Those three alternatives, Alternatives A, B, and C, represented a reasonable range of acreage available for mining, within which the Pilot Knob alternative fell. An agency is not required to consider alternatives that do not meet the purposes or objectives of the federal action. <u>Biodiversity Conservation All. v. Jiron</u>, 762 F.3d 1036, 1085 (10th Cir. 2014). The categorical prohibition on access to coal in Pilot Knob, given "the State's interest in not foreclosing opportunities for exploration and development of coal resources," III Aplt. App. 266, was a sufficient reason for not considering it in greater detail.

The "alternatives analysis" need only satisfy a "rule of reason." <u>Colo. Envtl. Coal. v. Dombeck</u>, 185 F.3d 1162, 1174 (10th Cir. 1999). This is not a case where the agency defined the objectives in such a manner that they could only be satisfied by one alternative. Agencies need only briefly discuss their reasons for rejecting a possible alternative. <u>Utahns for Better Transp. v. U.S. Dep't of Transp.</u>, 305 F.3d 1152, 1166 (10th Cir. 2002) (quoting 40 C.F.R. § 1502.14(a)).

The court concludes that the Pilot Knob alternative advances the purposes of the action, and that the Forest Service's explanation for rejecting it is arbitrary and capricious. According to the court, the rejection "is based solely on the fact that the Pilot Knob Alternative would protect more land and provide access to fewer tons of coal than Alternative B (reinstating the entire North Fork Exception)," which it argues is a rationale that could be applied to every other alternative.[1] The court also concludes that because the rejection did not mention the Elk Creek Mine (which is within Pilot Knob), the argument that Alternative C did not foreclose future access to existing federal coal or private leases constitutes a post-hoc rationalization.

Both the Pilot Knob alternative (5,000 acres) and Alternative C (7,100 acres) removed acreage from coal development in order to preserve certain roadless areas. Unlike the Pilot Knob alternative, however, Alternative C did not foreclose future access to existing federal coal leases or private leases and recoverable coal. The SFEIS contained a map that identified existing and proposed coal leases and indeed mentioned the Elk Creek Mine, although it did point out that production idled in December 2015, in favor of final reclamation. III Aplt. App. 272, 273 Fig. 3-1; see also IV Gov't Supp. App. 940 (noting that the operator continued to show interest and another operator could theoretically operate in the future).

---

[1] While simple, this characterization is not a reasonable reading of the agency's rationale. The agency did not expressly or tacitly reject every alternative because it did not mirror the alternative selected.

2

On this record, I disagree with the court's conclusion that the agency engaged in a "post-hoc rationalization" regarding the Elk Creek Mine. The agency clearly articulated that it excluded the Pilot Knob alternative because it failed to "preserve[] the option of future coal exploration and coal-related surface activities." III Aplt. App. 270. It then discussed sites where coal mining has taken place and where existing mines sit on federal leases within the affected area, including the Elk Creek Mine. Id. at 272. The Pilot Knob alternative foreclosed access to that mine, idled or not, which fits squarely within the agency's rationale for rejection. The agency was not required to explicitly "state that the Pilot Knob Alternative was eliminated from detailed study because of the existence of the Elk Creek Mine" in order to allow a court to affirm on those grounds. Rather, its reasoning needed to be "clearly disclosed in, and sustained by, the record." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir. 1994). I believe that standard was met here. The court's contrary holding risks distorting the administrative record by ignoring obviously relevant facts that were considered but not expressly mentioned in an agency's brief discussion of its reasons for eliminating an alternative.

I disagree that this case is analogous to N.M. ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683 (10th Cir. 2009), where the agency took oil and gas development of Otero Mesa as a foregone conclusion and should have analyzed an alternative that would have precluded development. Here, the agency evaluated in detail a no-action alternative (Alternative A) that would have preserved all 19,700 acres of the North Fork area as roadless. A no-action alternative that continues existing development in an area is a "far cry" from an alternative that would prohibit development entirely. Id. at 711.

3

The court is correct that we cannot sustain the agency's decision on the ground that the Pilot Knob alternative was not "significantly distinguishable" from Alternative C. Id. at 708–09. The agency did not advance this reason for elimination in its SFEIS and we must affirm, "if at all, on grounds articulated by the agency itself." Utahns for Better Transp., 305 F.3d at 1165. Yet the court's analysis of this issue necessarily grafts arbitrary benchmarks onto the rule of reason test and consequently curtails the discretion Congress vested in agencies through NEPA.

The court observes that the Pilot Knob alternative protects "nearly 30% less land" and affords access to "35% more coal" than Alternative C while affecting "entirely separate coal resources." The court also accepts plaintiffs' portrayal of the record as establishing that "the two alternatives would result in significantly different environmental impacts because the Pilot Knob Roadless Area is geographically separate from [the other roadless areas] and has dissimilar habitat features." I doubt that geographic separation of the areas, standing alone, renders the Pilot Knob alternative significantly distinguishable. Plaintiffs also assert that Pilot Knob is "ecologically unique" because it "contains the only winter range for deer and bald eagles, the only severe winter range for elk, and the only historic and potential future habitat for the imperiled Gunnison sage-grouse." Aplt Br. at 7. But the portions of the record cited demonstrate that these ecological features exist in other parts of the state, just not in other parts of the areas under consideration. See III Aplt. App. 279, 325, 328–39, 331. The record may establish that Pilot Knob is ecologically different from the other roadless areas, but it falls fall short of establishing that it is "ecologically unique," even assuming

4

that such a standard would properly factor into the significantly distinguishable branch of the rule of reason analysis.

The court identifies distinctions between the alternatives, but it is not at all clear that they are significant enough to trigger NEPA's statutory mandates. The court does not provide a limiting principle for this method of reexamining the merits of alternatives. Future parties are likely to seize on catchwords like "30% less land protected," "35% more coal made accessible," and "dissimilar habitat features" for what makes an alternative sufficiently distinguishable, notwithstanding a lack of grounding in NEPA or its implementing regulations. The court's opinion may provide a roadmap for delaying federal action rather than promoting informed decision-making through careful consideration of reasonable alternatives. Perhaps some other case may necessitate such line-drawing, but this is not it. Because this analysis is not necessary to the court's conclusion, prudence counsels against conducting it.

The Colorado Roadless Rule, including the 19,700-acre North Fork Exception, was the product of years of deliberation, periods of notice and comment, and compromise. Our review of an agency's decision to eliminate an alternative must be informed by a "rule of reason and practicality." Biodiversity Conservation All. v. Bureau of Land Mgmt., 608 F.3d 709, 714 (10th Cir. 2010). "The range of reasonable alternatives is not infinite," Jiron, 762 F.3d at 1083 (internal quotation and citation omitted), and agencies cannot be expected to consider alternatives of finer and finer distinction. See Prairie Band Pottawatomie Nation v. Fed. Highway Admin., 684 F.3d

1002, 1012 (10th Cir. 2012) ("By necessity, an agency must select a certain number of [alternatives] for serious study and eliminate the rest without detailed analysis."). This court's role under NEPA is not to "substitute our judgment" about what alternatives are most effective to achieve an action's purpose, but only to "determine whether the necessary procedures have been followed." Assocs. Working for Aurora's Residential Env't v. Colo. Dep't of Transp., 153 F.3d 1122, 1130 (10th Cir. 1998). The agency met its mandate here by considering a reasonable range of alternatives and "briefly discuss[ing]" its reasons for eliminating others from detailed analysis. 40 C.F.R. § 1502.14(a); see also 42 U.S.C. § 4332(C). For these reasons, I would affirm the district court's judgment.