NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAY 5 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS



| | |
|---|---|
| NEIGHBORS OF THE MOGOLLON RIM, INC., <br><br> Plaintiff-Appellant, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; UNITED STATES FISH AND WILDLIFE SERVICE, <br><br> Defendants-Appellees. | No.   22-15259 <br><br> D.C. No. 2:20-cv-00328-DLR <br><br> MEMORANDUM* |

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

Argued and Submitted February 8, 2023
Submission Withdrawn February 17, 2023
Resubmitted May 3, 2023
Phoenix, Arizona

Before: HAWKINS, GRABER, and CHRISTEN, Circuit Judges.

The United States Forest Service ("USFS") authorized cattle grazing on

several grazing allotments in the Tonto National Forest, in central Arizona.

Plaintiff Neighbors of the Mogollon Rim, whose members live in private

---

*       This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

subdivisions on inholdings within one of the allotments, challenged the agency's decision. The district court held that the Forest Service complied with the procedural requirements of the National Environmental Policy Act ("NEPA") when it prepared an Environmental Assessment ("EA") and issued a decision notice and a Finding of No Significant Impact. The court also held that the grazing plan complied with the National Forest Management Act ("NFMA") because it was consistent with the Tonto Forest Plan. Plaintiff timely appeals.

Reviewing de novo the district court's grant of summary judgment, Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank, 693 F.3d 1084, 1091 (9th Cir. 2012), we reverse and remand with instructions. We partially vacate the EA and the accompanying decision notice.

1. The Forest Service violated NEPA by inadequately considering and inadequately explaining the possible effects of the proposed agency action. See Sierra Club v. Bosworth, 510 F.3d 1016, 1018 (9th Cir. 2007) ("NEPA is a procedural statute that . . . 'provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" (quoting Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1070 (9th Cir. 2002))). Here, the EA has three major flaws.

First, the agency did not consider a reasonable range of alternatives. When reviewing whether an agency considered an adequate range of alternatives, the

"touchstone for [the] inquiry" is whether the "selection and discussion of alternatives fosters informed decision-making and informed public participation." Westlands Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853, 868 (9th Cir. 2004) (quoting California v. Block, 690 F.2d 753, 767 (9th Cir. 1982)).

The EA considered only a "no-grazing" alternative and the proposed action. Plaintiff maintains that the Forest Service should have considered a third alternative that authorized some grazing on the Bar X ranch, but not on the Colcord/Turkey Pasture. The Forest Service failed to give full and meaningful consideration to Plaintiff's proposed alternative, which maintains the status quo as to the closure of the Colcord/Turkey Pasture to grazing. See W. Watersheds Project v. Abbey, 719 F.3d 1035, 1050–53 (9th Cir. 2013) ("The existence of a viable but unexamined alternative renders an [EA] inadequate." (alteration in original) (quoting Westlands Water Dist., 376 F.3d at 868)).

The EA's primary rationale for rejecting Plaintiff's proposed alternative was that it would not advance the purpose and need of the project. The agency argues that, because the Colcord/Turkey Pasture is designated as "suitable" for livestock grazing by the Tonto Forest Plan, any alternative that excluded grazing on that pasture would be inconsistent with the EA's purpose and need. But that argument misconstrues the role of the Forest Plan. The designation of land as suitable for grazing does not eliminate the requirement for an appropriate NEPA analysis

3

before grazing is authorized.

The EA also rejected the potential third alternative because "[t]he scope of current management places it within the range of alternatives between the No Grazing and the Proposed action." To be sure, there is no minimum number of alternatives that must be considered: the focus is on the substance of the alternatives, not their number. Native Ecosystems Council v. USFS, 428 F.3d 1233, 1246 (9th Cir. 2005). But analyzing Plaintiff's proposed alternative is critical in this case. The agency did not consider maintaining the status quo, or any other option between "no grazing" and the proposed alternative. Thus, the only alternative considered by the EA that met the purpose and need of the project was the proposed action. See High Country Conservation Advocs. v. USFS, 951 F.3d 1217, 1224 (10th Cir. 2020) (holding that the agency's rationale for eliminating an alternative that protected some land while leaving other land open to coal exploration exhibited a "one-sided approach [that] conflicts with the agency's obligation under NEPA to 'provide legitimate consideration to alternatives that fall between the obvious extremes'" (quoting Colo. Env't Coal. v. Dombeck, 185 F.3d 1162, 1175 (10th Cir. 1999))). Studying an alternative that excludes the Colcord/Turkey Pasture from grazing would not require the Forest Service to adopt that plan. Instead, it would allow the agency and the public to consider fully the effects of the different alternatives and express informed opinions. See W.

4

Watersheds Project, 719 F.3d at 1053–54 (remanding for consideration of alternative grazing plans that could feasibly meet the agency's grazing goals while better preserving cultural objects).

Second, the EA failed to consider adequately the potential effects of the agency's action on residents of the neighboring communities. The EA asserts that any effect on the Colcord and Ponderosa Communities would not be significant because "these subdivisions have always been within an active grazing allotment." But that reasoning overstates the importance of the Forest Plan's designation of that area as "suitable" for grazing and ignores the fact that the Colcord/Turkey Pasture has not actually been grazed for more than forty years, except in 2015. The agency's conclusory statement is insufficient to satisfy NEPA's requirements. See Bark v. USFS, 958 F.3d 865, 872 (9th Cir. 2020) (concluding that the agency violated NEPA by relying on a vague and uncertain analysis instead of meaningfully considering the effects of the proposed project).

The EA also states that "it [is] the responsibility of private landowners . . . to construct a lawful fence to keep out cattle." But the cited Arizona law addresses only whether liability attaches if trespassing cattle cause property damage. Ariz. Rev. Stat. Ann. § 3-1427. It does not create a mandate such that landowners adjacent to grazing allotments must fence their land. The lack of potential tort liability under state law does not dictate, or even inform, whether a federal

agency's action causes cognizable effects under NEPA.  For the purposes of NEPA, the Arizona law does not place a burden on landowners of constructing fences to avoid conflicts.

The EA does analyze the potential for same place-same time encounters with respect to <u>recreational</u> users and suggests possible adjustments to minimize those conflicts, such as fencing popular dispersed recreation corridors or adjusting grazing schedules.  Yet the EA does not discuss whether the permittee should maintain fencing or adjust grazing schedules to mitigate the prospect of encounters with landowners, residents, and car traffic in that area.  Additional analysis of same place-same time encounters with <u>residents and landowners</u> is necessary to support the Forest Service's conclusion that the grazing plan will not have a significant effect.

Third, the EA contains significant misstatements and errors that frustrate NEPA's goals of fostering informed decisionmaking and public participation.  "An agency fails to meet its 'hard look' obligation when it relies on incorrect assumptions or data . . . or presents information that is so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of alternatives."  <u>Native Ecosystems Council v. Marten</u>, 883 F.3d 783, 795 (9th Cir. 2018) (brackets omitted) (citation and internal quotation marks omitted).

The EA and the decision notice authorize 30% more grazing than is

supported by the Forest Service's grazing capacity analysis. The EA provides no explanation for this discrepancy, and the Forest Service now contends that this flaw is a typographical error. Plaintiff, however, maintains that there is a substantive error that resulted in permitting livestock numbers that exceed the agency's own grazing capacity analysis. Regardless of which explanation is correct, the error "materially affected the substance of the agency's decision." Idaho Wool Growers Ass'n v. Vilsack, 816 F.3d 1095, 1104 (9th Cir. 2016); see WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920, 926 (9th Cir. 2015) ("[T]he data the Forest Service provides to the public to substantiate its analysis and conclusions must . . . be accurate.").

Additionally, the historical grazing data are inaccurate and do not allow for proper comparison to the proposed action. That error alone may not be enough to render the NEPA analysis inadequate, but it is compounded by other methodological choices that prevent the public from making an informed comparison between the proposed alternatives and the current conditions. See Nat. Res. Def. Council v. USFS, 421 F.3d 797, 811 (9th Cir. 2005) ("NEPA does not force an agency to choose the most environmentally sound alternative, but it does ensure that agency action is 'fully informed and well considered.'" (quoting Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 558 (1978))).

7

Accordingly, we remand for the district court to enter an order directing the agency to determine whether to prepare a new EA or to prepare an Environmental Impact Statement ("EIS").

2. We decline to reach Plaintiff's argument that the Forest Service's decision not to prepare an EIS was arbitrary and capricious. See WildEarth Guardians v. Provencio, 923 F.3d 655, 669 (9th Cir. 2019) (explaining that a plaintiff must "raise 'substantial questions whether a project may have a significant effect' on the environment" to prevail on a claim that the agency's decision not to prepare an EIS was arbitrary and capricious (quoting Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998))). The significant flaws in the EA undermine the Forest Service's conclusion that the proposed action would have no significant effect on the environment. Because the seriously inadequate EA creates significant uncertainty, we cannot "categorically decide" that the agency could not support its conclusions in a revised EA. Ctr. for Biological Diversity v. NHTSA, 538 F.3d 1172, 1226 (9th Cir. 2008). The "EA is so procedurally flawed that we cannot determine whether the proposed rule or project may have a significant effect." Id. at 1225. A full EIS may be necessary, but we leave that decision for the agency to consider in the first instance on remand. See W. Watersheds Project, 719 F.3d at 1053–54 (holding that the agency failed to consider a reasonable range of alternatives and remanding for the agency

to either remedy the deficiencies in the EA or prepare a more detailed EIS).

3. We also decline to reach Plaintiff's NFMA claim. After redoing the NEPA analysis, the agency may decide to make different choices. See Or. Nat. Desert Ass'n v. Bureau of Land Mgmt., 625 F.3d 1092, 1124 (9th Cir. 2010) ("NEPA is not a paper exercise, and new analyses may point in new directions."). Thus, it is not necessary to consider whether the current grazing plan complies with NFMA, because a revised grazing plan may be substantively different.

4. We grant Plaintiff's request for partial vacatur of the EA and accompanying decision notice. "Although not without exception, vacatur of an unlawful agency action normally accompanies a remand." All. for the Wild Rockies v. USFS, 907 F.3d 1105, 1121 (9th Cir. 2018) (emphasis omitted) (citing Alsea Valley All. v. Dep't of Com., 358 F.3d 1181, 1185 (9th Cir. 2004)). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" Cal. Cmtys. Against Toxics v. U.S. EPA, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (quoting Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

The agency's errors here are significant and vacatur will not cause an environmental harm. Thus, the presumption of vacatur is not overcome. Cf. Pollinator Stewardship Council v. U.S. EPA, 806 F.3d 520, 532 (9th Cir. 2015)

9

("When deciding whether to vacate rulings by the EPA, we consider whether vacating a faulty rule could result in possible environmental harm, and we have chosen to leave a rule in place when vacating would risk such harm."); All. for the Wild Rockies, 907 F.3d at 1121–22 (vacating agency action because the government failed to address potential environmental harms and thus could not overcome the presumption of vacatur).

In this case, partial vacatur is sufficient to prevent the harms flowing from the inadequate NEPA analysis. See N. Cheyenne Tribe v. Norton, 503 F.3d 836, 843–44 (9th Cir. 2007) (upholding a partial injunction because it was sufficient to remedy the failures of the agency's NEPA analysis). The main flaws in the EA are related to the authorization of grazing on the Colcord/Turkey Pasture and the increase in permitted livestock. On remand, we order the district court to partially vacate the EA and the accompanying decision notice to the extent that they allow grazing on the Colcord/Turkey Pasture and authorize more than the equivalent of 374 adult cattle.[1]

---

[1] The grazing capacity analysis calculated that the Colcord/Turkey Pasture could support 1,154 Animal Unit Months ("AUMs"). If the Colcord/Turkey Pasture is excluded from grazing, the grazing capacity analysis calculated that the remaining Bar X and associated Driveway pastures could support 5,927 AUMs. It is unclear from the EA whether the agency intended to use a conversion factor of 1.0 or 1.32. Because our grant of partial vacatur is intended to ensure that grazing is not authorized beyond the level supported by the EA, we err on the side of caution and apply a conversion factor of 1.32. Thus, we calculate that the carrying capacity of

**REVERSED and REMANDED for further proceedings consistent with this disposition.**

---

the reduced grazing area is the equivalent of 374 adult cattle, where adult cattle may include cow/calf pairs.